UNITED STATES DISTRICT COURT
FOR THE
DISTRICT OF VERMONT

Harley Breer, Jr.,

    Plaintiff,

        v.                                                    Civil Action No. 2:12-cv-53

Michelle Medor, Brian Reed, Charles Cross,
James Honsinger, Steve Maranville,

    Defendants.

## REPORT AND RECOMMENDATION
(Doc. 24)

    Plaintiff Harley Breer, Jr., an inmate committed to the custody of the Vermont Department of Corrections ("DOC"), brings this action *pro se* under 42 U.S.C. § 1983, alleging that he was sexually assaulted and harassed by a female corrections officer, and that other corrections officers, supervisors, and officials failed to prevent the alleged assault and harassment.  Breer also claims that he was subjected to segregation and high security without due process, and was threatened with retaliation if he grieved or otherwise complained about the alleged misconduct.

    Presently before the Court is Defendants' Motion to Dismiss the Amended Complaint for failure to state a claim upon which relief can be granted pursuant to Fed. R. Civ. P. 12(b)(6).  (Doc. 24.)  For the reasons stated below, I recommend the Motion to Dismiss be GRANTED with respect to: (1) all claims against Defendant Maranville; (2) Breer's causes of action under the federal Prison Rape Elimination Act, 42 U.S.C. §

15601 ("PREA") and Vermont criminal statutes; and (3) Breer's Eighth Amendment claim against Defendants Reed and Honsinger. I recommend that the Motion to Dismiss be otherwise DENIED.

## Factual and Procedural Background

### I. Relevant Facts

For purposes of Defendants' Motion, all facts alleged in the Amended Complaint are accepted as true, as summarized below.

During the spring of 2003, Breer was in the custody of the DOC at the Northwest State Correctional Facility ("NWSCF") in Swanton, Vermont, awaiting sentencing for an unspecified offense. Beginning in March and continuing for several months, Defendant Medor, a corrections officer at NWSCF, passed "merely friendly" typewritten letters to Breer once or twice a week, directing Breer to "flush[]" them after reading them. (Doc. 22 at 3, ¶ 4.) Thereafter, Medor began "talking suggestively and personally" to Breer, forcefully kissing him, and trying to place Breer's hands on her breasts. (*Id.* at 4, ¶ 7.)

Medor's conduct made Breer a "nervous wreck," but Medor threatened that if Breer tried to end the relationship or disclose it to others, she would "put all the blame on [Breer]" and "tell the inmates [Breer] was an informant." (*Id.* at 5, ¶ 8.) Toward the end of June and beginning of July, Medor entered Breer's cell on ten-to-fifteen occasions and engaged in sexual contact with Breer, including fondling his genital area, performing oral sex on him, and requiring him to digitally massage her vaginal area. (*Id.* at 5-6.) Around this time, Breer informed Defendant Cross, a supervisor at NWSCF, that "he had a dirty officer and she was pressuring [him] to do things of a sexual nature." (*Id.* at 6-7, ¶ 11.)

2

Cross told Breer that he knew about the misconduct but advised against making a "concrete allegation" against Medor because it "might backfire." (*Id*. at 7, ¶ 11.) The conversation ended without a plan being made to address Medor's conduct. (*Id.*)

In early July, after an inmate saw Breer and Medor together, they were separately told to report to the Chief of Security's Office for a meeting with Defendants Reed (Chief of Security), Honsinger (a supervisor), and two other officers. (*Id*. at 7-8, ¶¶ 13-14.) During this meeting, Breer was told that the "best way to avoid the next 6-12 months in segregation" would be to "listen an[d] not talk." (*Id*. at 8, ¶ 14.) Reed and Honsinger informed Breer that they knew about the inappropriate sexual contact between Medor and Breer, and advised that "it was to stop now." (*Id.*) They stated that they liked Medor and did not want her to lose her job, that "this discussion was not leaving the room," and that "the inciden[t] was going to be kept secret from the administration as long as Medor stayed away from Breer and vice-versa." (*Id*.) The meeting concluded with Reed and Honsinger telling Breer that "there would be no grievances, no complaint, and no record of this conversation." (*Id*. (quotation marks omitted).)

After the July 2003 meeting with Reed and Honsinger, Breer avoided Medor, and it appears that no further sexual contact occurred. (*Id*. at 9, ¶ 15.) Medor became very upset that Breer was trying to avoid her and would "literally bawl," asking "why [Breer] wouldn't talk to her." (*Id.*) Because he was "stonewalling Medor's attempts at contact," Breer was threatened by Donald Morrill, another inmate, and Morrill's "associates." (*Id*. at 9, ¶ 16.) These threats culminated in Morrill "spitting in [Breer's] face in plain view of two officers who did nothing." (*Id.*)

3

"A short time" after Breer's July 2003 meeting with Reed and Honsinger, other inmates at NWSCF "provided affidavits" that resulted in the suspension and investigation of Medor, and the placement of Breer in segregation. (*Id*. at 9-10, ¶ 17.) Breer claims he was not afforded a "due[-]process hearing" prior to being segregated, and when he complained to Reed that he could not be placed in segregation "without due process," Reed responded, "you are in seg[regation] right, well then I guess [you] can." (*Id.* at 10, ¶ 17.) Breer filed "dozens of grievances," but "many officers refused to take or sign them" and stated they would not accept a grievance regarding Medor's alleged sexual assault of Breer or any related "cover[]up." (*Id.*) A few grievances were eventually "accepted," but no response was provided to Breer. (*Id.*)

In late July, Breer was transferred to the Northern State Correctional Facility ("NSCF") in Newport, Vermont. (*Id*. at 10, ¶ 17.) Most of Breer's paperwork was lost in the transfer, and although he was no longer harassed at the new facility, he had no phone or mail privileges there. (*Id.* at ¶ 18.) Breer thereafter served a portion of his sentence in Minnesota, and was later returned to Vermont, where he was "forced to max out his incarceration sentence." (*Id*. at 11, ¶ 20.) Breer claims that he was made to serve his maximum sentence as "backlash from the Medor situation." (*Id.*)

## II.   Procedural Background

Breer filed his original Complaint on March 14, 2012. (Doc. 5.) The Complaint contained very little factual detail, and thus I recommended granting Defendants' Motion to Dismiss and granting Breer leave to file an amended complaint. (Doc. 20.) The District Court adopted that recommendation (Doc. 23), and on December 13, 2012, Breer

4

filed the Amended Complaint currently under review. (Doc. 22.) The Amended Complaint contains much more detail than the original Complaint, and alleges causes of action generally under 42 U.S.C. § 1983, and specifically under 13 V.S.A. § 3257, Vermont's statute criminalizing sexual exploitation of an inmate, as well as the PREA. (*Id.*) Construing the Amended Complaint liberally, Breer also brings Eighth Amendment, retaliation, and due-process claims.

Breer seeks non-monetary relief in the form of: (a) issuance of a discovery order for the DOC to turn over "any and all documents, investigations, reports, affidavits, interviews, emails, notes, and videotape pertaining to the investigation, suspension, and termination of C.O. Michelle Medor;" (b) allocation of funds to allow Breer to be polygraphed independently regarding his claims; (c) termination from state employment for each person found to be responsible for the alleged unlawful acts, with a "permanent record" of this litigation being placed in their employment file; and (d) "set[ting] the matter for status and transport[ing] Plaintiff." (Doc. 22 at 15-16, ¶ 25.) Breer also seeks monetary relief in the form of compensatory damages for lost wages in the amount of $45,000 per year for each year he was incarcerated beyond his minimum sentence, plus interest. (*Id.* at 16, ¶ 26.) In addition, Breer seeks $5,000,000 in punitive damages for "pain and suffering, emotional distress, mental and physical trauma, assault, sexual assault, harassment, abuse of power, obstruction of justice, transfer out of state, months in segregation and years of high risk and stress living incarcerated and in fear of harm for being labeled by DOC as an informant in their attempt to cover up [sexual] assault." (*Id.*)

On April 3, 2013, Defendants filed the instant Motion to Dismiss. (Doc. 24.)

5

## Discussion

### I. Motion to Dismiss Standard

To survive a motion to dismiss pursuant to Fed. R. Civ. P. 12(b)(6), a complaint must "provide the grounds upon which [its] claim rests." *ATSI Commc'ns, Inc. v. Shaar Fund, Ltd.*, 493 F.3d 87, 98 (2d Cir. 2007). A plaintiff must also allege "enough facts to state a claim to relief that is plausible on its face." *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570 (2007); *see also* Fed. R. Civ. P. 8(a)(2) (pleading must contain a "short and plain statement of the claim showing that the pleader is entitled to relief"). "A claim has facial plausibility when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009). As described by the Supreme Court in *Iqbal* and *Twombly*, this does not require a plaintiff to provide "detailed factual allegations" to support his claims, but the "[f]actual allegations must be enough to raise a right to relief above the speculative level." *Twombly*, 550 U.S. at 555. The plaintiff must allege sufficient facts to show "more than a sheer possibility that a defendant has acted unlawfully." *Iqbal*, 556 U.S. at 678. If the plaintiff "ha[s] not nudged [his] claims across the line from conceivable to plausible, [his] complaint must be dismissed." *Twombly*, 550 U.S. at 570.

In assessing the adequacy of the pleadings, a court must accept all factual assertions as true and draw all reasonable inferences in favor of the plaintiff. *See Wilson v. Merrill Lynch & Co., Inc.*, 671 F.3d 120, 128 (2d Cir. 2011); *ATSI Commc'ns*, 493 F.3d at 98. A complaint is properly dismissed, where, as a matter of law, "the allegations

in [it], however true, could not raise a claim of entitlement to relief." *Twombly*, 550 U.S. at 558. Conversely, this presumption of truth "is inapplicable to legal conclusions," and therefore the court need not credit "[t]hreadbare recitals of the elements of a cause of action, supported by mere conclusory statements." *Iqbal*, 556 U.S. at 678; *see also Faber v. Metro. Life Ins. Co.*, 648 F.3d 98, 104 (2d Cir. 2011) ("We are not . . . bound to accept conclusory allegations or legal conclusions masquerading as factual conclusions.") (quotation marks omitted).

The question on a Rule 12(b)(6) motion to dismiss "'is not whether a plaintiff will ultimately prevail but whether the claimant is entitled to offer evidence to support the claims'" raised in the complaint. *Villager Pond, Inc. v. Town of Darien*, 56 F.3d 375, 278 (2d Cir. 1995) (quoting *Scheuer v. Rhodes*, 416 U.S. 232, 235-36 (1974)). "[T]he purpose of Federal Rule of Civil Procedure 12(b)(6) 'is to test, in a streamlined fashion, the formal sufficiency of the plaintiff's statement of a claim for relief without resolving a contest regarding its substantive merits,'" and without regard for the weight of the evidence that might be offered in support of the claims. *Halebian v. Berv*, 644 F.3d 122, 130 (2d Cir. 2011) (quoting *Global Network Commc'ns, Inc. v. City of New York*, 458 F.3d 150, 155 (2d Cir. 2006)). In essence, the question is whether some plausible narrative supports plaintiff's claim such that the case merits discovery; the Federal Rules of Civil Procedure "do[] not unlock the doors of discovery for a plaintiff armed with nothing more than conclusions." *Iqbal*, 556 U.S. at 678-79.

In cases involving a *pro se* plaintiff, as here, a court must construe the complaint "liberally," *Harris v. Mills*, 572 F.3d 66, 72 (2d Cir. 2009), by "reading such submissions

7

'to raise the strongest arguments they suggest.'" *Bertin v. United States*, 478 F.3d 489, 491 (2d Cir. 2007) (quoting *Burgos v. Hopkins*, 14 F.3d 787, 790 (2d Cir. 1994)). "This policy of liberally construing *pro se* submissions is driven by the understanding that, '[i]mplicit in the right of self-representation is an obligation on the part of the court to make reasonable allowances to protect *pro se* litigants from inadvertent forfeiture of important rights because of their lack of legal training.'" *Triestman v. Fed. Bureau of Prisons*, 470 F.3d 471, 475 (2d Cir. 2006) (quoting *Traguth v. Zuck*, 710 F.2d 90, 95 (2d Cir. 1983)). In assessing *pro se* complaints challenged by Rule 12(b)(6) motions to dismiss, courts "apply[] a more flexible standard to evaluate their sufficiency than . . . when reviewing a complaint submitted by counsel." *Lerman v. Bd. of Elections in City of N.Y.*, 232 F.3d 135, 139-40 (2d Cir. 2000). "This is particularly so when the *pro se* plaintiff alleges that h[is] civil rights have been violated." *Sealed Plaintiff v. Sealed Defendant*, 537 F.3d 185, 191 (2d Cir. 2008). Nonetheless, even *pro se* litigants "remain subject to the general standard applicable to all civil complaints under the Supreme Court's decisions in *Twombly* and *Iqbal*." *Brickhouse v. City of New York*, No. 09 CIV. 9353(NRB), 2010 WL 3341845, at *2 (S.D.N.Y. Aug. 16, 2010); *see Bisson v. Martin Luther King Jr. Health Clinic*, No. 07-5416-CV, 2008 WL 4951045, at *1 (2d Cir. Nov. 20, 2008); *see also Triestman*, 470 F.3d at 477 ("*pro se* status does not exempt a party from compliance with relevant rules of procedural and substantive law").

## II.     Personal Involvement of Defendant Maranville

Defendants contend that any claims against NWSCF Superintendent Maranville should be dismissed for lack of personal involvement. It is well established in the Second

Circuit that the "personal involvement of defendants in alleged constitutional deprivations is a prerequisite to an award of damages under § 1983." *Moffitt v. Town of Brookfield*, 950 F.2d 880, 886 (2d Cir. 1991) (quotation marks omitted).  Accordingly, a prison official cannot be held personally liable under § 1983 on the basis of *respondeat superior*.  *See Colon v. Coughlin*, 58 F.3d 865, 874 (2d Cir. 1995).  Instead, "a plaintiff must plead that each Government-official defendant, through the official's own individual actions, has violated the Constitution." *Iqbal*, 556 U.S. at 676.  Direct participation, however, is not strictly necessary.  Personal involvement can be shown by:

> evidence that: (1) the defendant participated directly in the alleged constitutional violation, (2) the defendant, after being informed of the violation through a report or appeal, failed to remedy the wrong, (3) the defendant created a policy or custom under which unconstitutional practices occurred, or allowed the continuance of such a policy or custom, (4) the defendant was grossly negligent in supervising subordinates who committed the wrongful acts, or (5) the defendant exhibited deliberate indifference to the rights of inmates by failing to act on information indicating that unconstitutional acts were occurring.

*Colon*, 58 F.3d at 873.

Here, there is no allegation that Maranville was directly involved in unconstitutional conduct.  Nor does the Amended Complaint allege a custom or policy that would either promote or allow unconstitutional practices.  The Amended Complaint does claim that "[a]ll staff were [Maranville's] responsibility, as was [Breer]."  (*Id.*)  However, the fact that Maranville occupied a position of high authority in the prison is insufficient to sustain a § 1983 claim.  *See Colon*, 58 F.3d at 874 ("The bare fact that [the defendant] occupies a high position in the New York prison hierarchy is insufficient to sustain [plaintiff's] claim"); *see also Richardson v. Goord*, 347 F.3d 431, 435 (2d Cir.

9

2003) ("[M]ere linkage in the prison chain of command is insufficient to implicate a state commissioner of corrections or a prison superintendent in a § 1983 claim." (internal quotation marks omitted)).

Breer also claims that it was part of Maranville's job to tour the segregation cells, and that as a result, he must have known that Breer's due-process rights had been violated. Specifically, Breer asserts that Maranville should have "been astute enough to expect grievances . . . or complaintive [sic] letters or filings from [Breer]," and that "when [Maranville] saw none of this it should have been a red flag to him that procedure and directive were not being followed." (Doc. 22 at 14-15, ¶ 23(E).) Significantly, Breer does not claim that Maranville actually saw him in segregation, or had any other notice of the process afforded–or not afforded–to Breer prior to his placement in segregation. Consequently, Breer has failed to allege that Maranville neglected "to act on information indicating that unconstitutional acts were occurring." *Colon*, 58 F.3d at 873. Breer has also failed to assert facts sufficient to support a claim of grossly negligent supervision. *See Am. Tel. & Tel. Co. v. City of New York*, 83 F.3d 549, 556 (2d Cir. 1996) ("[g]ross negligence is conduct that evinces a reckless disregard for the rights of others or smacks of intentional wrongdoing" (internal quotation marks omitted)). I therefore recommend that the Motion to Dismiss Breer's claims against Maranville be GRANTED.

### III. Prison Rape Elimination Act Claim

Defendants further argue that the PREA does not create a private right of action that may be adjudicated under 42 U.S.C. § 1983. In *Chinnici v. Edwards*, No. 1:07-CV-229, 2008 WL 3851294, at *3 (D. Vt. Aug. 12, 2008), this Court unambiguously held that

10

the PREA "confers no private right of action." The Court explained: "The PREA is intended to address the problem of rape in prison, authorizes grant money, and creates a commission to study the issue. *The statute does not grant prisoners any specific rights*." *Id.* (emphasis added) (citation omitted); *see also Chao v. Ballista*, 772 F. Supp. 2d 337, 341 n.2 (D. Mass. 2011) (collecting cases, and noting that "every court to address the issue" has held that the PREA does not allow a private cause of action). Furthermore, most of the alleged wrongdoing in this case took place prior the PREA's enactment on September 4, 2003. *See* 42 U.S.C. § 15601; *Winbush v. Norris*, No. 5:06CV00065 JLH, 2006 WL 2252539, at *2 (E.D. Ark. Aug. 7, 2006). Accordingly, Breer's reliance on the PREA is misplaced, and to the extent his claims are grounded on this statute, they should be DISMISSED.

**IV.    Claims Under State Criminal Statutes**

Breer also brings a claim under 13 V.S.A. § 3257, Vermont's statute criminalizing sexual exploitation of an inmate, and an obstruction of justice claim. Obstruction of justice is a criminal violation under 13 V.S.A. § 3015. Neither of these criminal statutes provides a private right of action. *See Madden v. Abate*, 800 F. Supp. 2d 604, 606-07 (D. Vt. 2011) (noting that "the existence of a criminal statute prohibiting certain conduct does not in and of itself create a private right of action that may be brought by the victim of that conduct"); *see also Luckett v. Bure*, 290 F.3d 493, 497 (2d Cir. 2002) ("We affirm the district court's dismissal of Luckett's claims of sabotage, forgery, and perjury, which are crimes and therefore do not give rise to civil causes of action."). Furthermore, a private citizen does not have a constitutional right to initiate or compel the initiation of

11

criminal proceedings against another individual. *Linda R.S. v. Richard D.*, 410 U.S. 614, 619 (1973) ("[I]n American jurisprudence at least, a private citizen lacks a judicially cognizable interest in the prosecution or nonprosecution of another"); *McCrary v. County of Nassau*, 493 F. Supp. 2d 581, 588 (E.D.N.Y. 2007) ("A private citizen does not have a constitutional right to compel government officials to arrest or prosecute another person."); *Osuch v. Gregory*, 303 F. Supp. 2d 189, 194 (D. Conn. 2004) ("An alleged victim of a crime does not have a right to have the alleged perpetrator investigated or criminally prosecuted."). I therefore recommend the Court DISMISS Breer's causes of action brought pursuant to Vermont criminal statutes.

## V.     Constitutional Claims

Defendants next argue that Breer's Amended Complaint fails to state a claim under the Eighth Amendment to the United States Constitution. Giving the Amended Complaint the required liberal reading, and as more fully discussed below, the Court construes Breer's claims as also asserting due process and retaliation claims. Because the Motion to Dismiss presents separate arguments for each Defendant, the Court will address those arguments in turn.

### A.     Defendant Medor

Defendants contend that any Eighth Amendment claim against Defendant Medor fails because Breer "alleges no physical force or overt threats were used to compel him to engage in the behavior." (Doc. 24 at 10.) Under the law of this circuit, however, "there can be no doubt that severe or repetitive sexual abuse of an inmate by a prison officer can be 'objectively, sufficiently serious' enough to constitute an Eighth Amendment

violation." *Boddie v. Schnieder*, 105 F.3d 857, 861 (2d Cir. 1997) (quoting *Farmer v. Brennan*, 511 U.S. 825, 834 (1994)). Indeed, sexual abuse by prison officials is "'simply not part of the penalty that criminal offenders pay for their offenses against society.'" *Id.* (quoting *Farmer*, 511 U.S. at 834). In *Boddie*, the Second Circuit explained that while "severe or repetitive sexual abuse of an inmate by a prison officer" can constitute a violation of an inmate's Eighth Amendment rights, "a small number of incidents in which [an inmate] allegedly was verbally harassed, touched, and pressed against without his consent" would not constitute such a violation. *Id.*

Here, the Amended Complaint alleges that Medor engaged in substantial sexual contact with Breer on numerous occasions. The facts are alleged within a specific time frame, contain specific detail regarding Medor's behavior, and go well beyond "a small number of incidents." *Id.* Because the allegations are sufficiently serious to constitute Eighth Amendment violations, I recommend that the Motion to Dismiss Defendant Medor be DENIED.

### B. Defendant Cross

Breer claims that Defendant Cross knew about Medor's misconduct and failed to take corrective action. (Doc. 22 at 6-7.) Specifically, Breer alleges that he informed Cross that there was "a dirty officer" who was "pressuring [Breer] to do things of a sexual nature," to which Cross allegedly responded, "I know." (*Id.*) Breer further alleges that Cross told him "in a fatherly and non-threatening manner that making a concrete allegation against Medor might backfire, not be believed, and would possibly result in retaliation." (*Id.* at 7.) Nonetheless, Breer contends that Cross failed to take corrective

13

action, "allow[ing] the situation to continue." (*Id.*)

These facts are sufficient to constitute a deliberate indifference claim against Cross. In the words of *Colon*, Cross was a supervisory official who, "after being informed of the violation through a report or appeal, failed to remedy the wrong." *Colon*, 58 F.3d at 873. According to the Amended Complaint, Cross admitted to Breer that he had prior knowledge of Medor's misconduct, as evidenced by Cross's alleged statement, "I know," when Breer raised the issue. From this statement, the Court may reasonably infer that Cross had knowledge of Medor's conduct beyond Breer's description of "things of a sexual nature," and was thus aware of sexual conduct that rose to the level of an Eighth Amendment violation. *See Burgos*, 14 F.3d at 790 (courts must read *pro se* pleadings "to raise the strongest arguments they suggest"). Because Cross allegedly failed to take any corrective action based upon this knowledge, and there is no suggestion in the Amended Complaint that he reported the alleged misconduct, the Court should not dismiss the claim against him at this time.

### C.   Defendants Reed and Honsinger

Breer claims that Defendants Reed and Honsinger exhibited deliberate indifference in failing to "take full action to bring all inappropriate conduct [between him and Medor] to a halt." (Doc. 22 at 13.) According to the Amended Complaint, Breer interacted with Reed on two occasions. The first interaction was the meeting that took place between Breer, Reed, and Honsinger in early July 2003, apparently the result of another inmate seeing Breer and Medor together in Breer's cell. (*Id.* at 7-8.) The second interaction was the brief exchange of words between Reed and Breer when Breer was

placed in segregation soon after the July 2003 meeting. (*Id.* at 10.) Breer alleges that during that meeting, Reed and Honsinger informed him that they knew about the "inappropriate sexual contact" between Medor and Breer and that "it was to stop now." (Doc. 22 at 8.) Breer claims that Reed did most of the talking, but Honsinger was also a "vocal participant and worked hand in hand with . . . Reed to amplify the message." (*Id.* at 14.)

Unlike the claims against Cross, these allegations indicate that as soon as Reed and Honsinger became aware of the relationship between Medor and Breer, steps were taken to stop the alleged sexual abuse. (Doc. 22 at 7-8.) There are no allegations that these individuals had knowledge of any sexual abuse prior to July 2003. Moreover, Breer alleges that after the July 2003 meeting, although Medor still tried to have contact with him, there was no further sexual abuse. A short while later, Medor was allegedly suspended pending an investigation. (*Id.* at 9-10.) Given these allegations, Breer has failed to plead deliberate indifference as required for an Eighth Amendment claim against Reed and Honsinger. *See Farmer*, 511 U.S. at 834 (holding that under the Eighth Amendment, the required "state of mind is one of 'deliberate indifference' to inmate health or safety").

The Amended Complaint further alleges that Breer was threatened during the meeting with Reed and Honsinger, and retaliated against thereafter. Specifically, he claims that Reed and Honsinger warned him not to file any grievances or complaints, that doing so would result in indefinite segregation, and that he was subsequently placed in segregation and subjected to "high security." Breer also claims that he was forced to

15

serve his maximum sentence because of the Medor incident. Such conduct by prison officials may give rise to viable claims under § 1983. Defendants do not address these claims in their Motion to Dismiss.

To state a prima facie case of retaliation with respect to protected speech, such as the filing of a grievance, a prisoner generally must show: "(1) that the speech or conduct at issue was protected; (2) that the defendant took adverse action against the plaintiff; and (3) that there was a causal connection between the protected speech and the adverse action." *Dawes v. Walker*, 239 F.3d 489, 492 (2d Cir. 2001); *Gill v. Pidlypchak*, 389 F.3d 379, 380 (2d Cir. 2004). An objective test is applied to determine whether an action is "adverse" within the meaning of this standard, such that the retaliatory action must be sufficient to "deter a similarly situated individual of ordinary firmness from exercising his or her constitutional right." *Dawes*, 239 F.3d at 493. The Second Circuit has explained that "it is the plaintiff's allegation of chilling that makes the [official's] action ostensibly 'adverse' in the first place." *See Gill*, 389 F.3d at 382.

Here, the Court may infer that the threats from Reed and Honsinger prevented Breer from engaging in protected speech. *See Gayle v. Gonyea*, 313 F.3d 677, 682 (2d Cir. 2002) (prisoner's filing of a prison grievance is protected by the First Amendment). In fact, Breer's claims against both Reed and Honsinger assert that he was not "allowed complaint or due process." (Doc. 22 at 14.) Breer has therefore stated a plausible retaliation claim.

With respect to due process, Breer claims that prison officials, ostensibly including Reed and Honsinger, not only threatened him with segregation, but then

proceeded to subject him to segregation and other punishments without a hearing. Specifically, Breer claims that he was "given absolutely no due process on any level with respect to either his months in segregation and high security nor the grievance process." While the due-process analysis will likely focus on Breer's entitlement to such process, *see Sandin v. Conner*, 515 U.S. 472, 484 (1995), including the duration and conditions of his confinement, *see Palmer v. Richards*, 364 F.3d 60, 64 (2d Cir. 2004), there has been no briefing on these issues. Accordingly, the Court should decline to dismiss Breer's due-process claims at this time.

## Conclusion

For the reasons stated above, I recommend that Defendants' Motion to Dismiss be GRANTED with respect to: (1) all claims against Defendant Maranville; (2) Breer's causes of action under the PREA and Vermont criminal statutes; and (3) Breer's Eighth Amendment claim against Defendants Reed and Honsinger. I recommend that the Motion to Dismiss be otherwise DENIED.

Dated at Burlington, in the District of Vermont, this 19th day of July, 2013.

/s/ John M. Conroy
John M. Conroy
United States Magistrate Judge

Any party may object to this Report and Recommendation within fourteen days after service thereof, by filing with the Clerk of the Court and serving on the Magistrate Judge and all parties, written objections which shall specifically identify those portions of the Report and Recommendation to which objection is made and the basis for such objections. *See* 28 U.S.C. § 636(b)(1); Fed. R. Civ. P. 6(a), 6(d), 72(b)(2); L.R. 72(c). Failure to timely file such objections "operates as a waiver of any further judicial review of the magistrate's decision." *Small v. Sec'y of Health and Human Servs.*, 892 F.2d 15, 16 (2d Cir. 1989).